FILED
CLERK, U.S. DISTRICT COURT

JUL 2 8 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

JACOB LEE SPENCER,

        Petitioner,

    v.

LEE ANN CHRONES, Warden,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

NO. ED CV 04-861-ODW(E)

ORDER ADOPTING FINDINGS,

CONCLUSIONS AND RECOMMENDATIONS

OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge.   The Court approves and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that Judgment be entered denying and dismissing the Petition with prejudice.

///

///

///

///

1        IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2    the Magistrate Judge's Report and Recommendation and the Judgment

3    herein by United States mail on Petitioner and counsel for

4    Respondent.

5

6        LET JUDGMENT BE ENTERED ACCORDINGLY.

7

8        DATED:    _07-28_____, 2010.

9

10

11   _____

12       OTIS D. WRIGHT II
        UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| JACOB LEE SPENCER, | ) | NO. ED CV 04-861-ODW(E) |
| Petitioner, | ) | |
| v. | ) | REPORT AND RECOMMENDATION OF |
| LEE ANN CHRONES, Warden, | ) | UNITED STATES MAGISTRATE JUDGE |
| Respondent. | ) | |

This Report and Recommendation is submitted to the Honorable Otis D. Wright II, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05-07 of the United States District Court for the Central District of California.

**PROCEEDINGS**

Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody" on July 15, 2004. Respondent filed a Return on September 20, 2004. Petitioner filed a Traverse on November 19, 2004. On May 14, 2010, this case was transferred from Magistrate Judge Woerhle to Magistrate Judge Eick.

**BACKGROUND**

An Information charged Petitioner with torture, rape, inflicting corporal injury on a cohabitant, assault with a deadly weapon, criminal threat, two counts of misdemeanor child endangerment, and various enhancements (Clerk's Transcript ("C.T.") at 371-74). A jury found Petitioner not guilty of rape, but guilty of all of the other charged offenses (Reporter's Transcript ("R.T.") 747-3-747-7). Petitioner received a sentence of ten years to life in state prison (R.T. 773; C.T. 417-18, 438-39).

The Court of Appeal affirmed the judgment in a reasoned opinion (Lodgment 5). The California Supreme Court summarily denied Petitioner's petition for review (Lodgment 7).

**SUMMARY OF TRIAL EVIDENCE**

The following summary is taken from the opinion of the California Court of Appeal. See Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009) (taking factual summary from state appellate decision).

> Defendant and the victim had been romantically involved
> for several years, and had two children together. The
> victim eventually tried to terminate the relationship
> because of defendant's promiscuity, but defendant resisted,
> saying that he wanted to make the relationship work. In
> December 1999, an argument escalated into domestic violence
> by defendant and a resulting conviction.

2

While defendant was in jail on the 1999 domestic relations conviction, he called the victim on numerous occasions.  Initially, they talked about the children and defendant talked about getting back together.  About midway through his stay, however, the victim told him that their relationship was over.  The victim told defendant that she had met somebody else and this seemed to upset defendant.

When defendant was released from jail in January 2000, the victim agreed to pick him up around midnight.  But the victim was late and defendant was no longer there.  When the victim got back home, she found defendant standing in the front doorway.  Defendant immediately asked her why she was late picking him up and accused her of being with another man.

Defendant helped her get the children out of the car and into the house, then insisted on talking with the victim.  The victim went in to the kitchen and got the telephone because she knew she was probably going to have to call the police.  Defendant unplugged the telephone, then punched her in the face with his fist hard enough to knock her backwards off her chair.  Although the victim did not testify to any additional punches, she told a police officer that while she was on the floor, defendant punched her twice more.  As the victim tried to get up off the floor, defendant grabbed a dinner plate and struck her in the forehead, breaking the plate and causing her head to bleed

3

profusely.

The children were screaming by then, so defendant told them to go to their room.  Defendant said he did not want to go through this and began trying to clean up the blood off the wall.  Defendant picked up the broken plate, put it in a plastic bag, and cut up the telephone cord.

Once the children were in their room, defendant turned out all the lights and began talking about the victim being with somebody else.  Defendant said the victim "gave his pussy away" and "gave up [her] pussy for a 9.99 lobster dinner."  Defendant said he wanted to see if she had had sex with the other man before picking him up, and said "you probably was with the guy and you were giving him a last fucking before I came."

Defendant tried to get the victim to go to the bedroom, but she refused.  He then told her to come over to him and she did.  Defendant mumbled about some other man touching her, then said "if a man can get my pussy for a 9.99 dinner, well, I'm going to take it."  Defendant bent the victim over the loveseat and had sexual intercourse with her.  The victim said that she did not resist because she just wanted to get it over with.

After sex, the victim told defendant that she needed to see a doctor for her wound.  Defendant responded that he

4

1  would let her get medical attention when the time was right.

2  Defendant told her that he would kill her if she tried to

3  leave.  The victim walked around the house for awhile trying

4  to figure out how to get away.  The victim tried opening one

5  of the windows in the children's room, but defendant heard

6  her and told her to get back in the living room.  The victim

7  then laid down on the couch and fell asleep.

8

9  In the morning, the victim started getting the children

10  ready for school, but defendant said that nobody was going

11  anywhere, that they could go when he left.  Defendant began

12  taking his things out of his car, and took the broken plate

13  and the cut telephone cord out to the trash.  While

14  defendant was out by his car, the victim escaped out the

15  patio door.  A neighbor took her in and helped her call 911.

16

17  Defendant disappeared for some time and was

18  subsequently arrested on a warrant.  On the way to the

19  police station, defendant voluntarily talked about the case.

20  Defendant asked the arresting officer if he knew what the

21  warrant was about.  When the officer indicated that he did

22  not, defendant explained that it was for "kicking [my]

23  girlfriend's ass."  Defendant said that he "beat her ass

24  twice for fucking around."  Defendant said that he had

25  previously gone to jail for beating her and when he got out

26  of jail he went right back over to her apartment with the

27  intent of "kicking her ass again."  Defendant said that when

28  he got to her apartment she started begging him to get back

5

together with her.  Defendant agreed and said he was sorry
just so that he could have sex with her, but he intended to
beat her again once they were done.  Defendant claimed that
when they were done, he told the victim:  "I didn't believe
you, bitch.  You're still a slut."  Then he started "kicking
her ass."  Defendant indicated that he beat the victim
"beyond the norm."  Defendant said he was not satisfied
after the first time he beat her and still was not satisfied
after beating her again.  Defendant said he did not know
what he was going to have to do to be satisfied.  Defendant
said that he knew he was going to jail, but did not care
because he knew he would get out eventually . . .

Defendant testified at trial that while he was in
prison, he and the victim talked about putting their
problems behind them and raising their children in a
Christian home.  When the victim failed to pick him up from
jail, he got a ride home with another prisoner who had also
been released.  Defendant testified that when the victim
came home, they put the children in bed and then went to the
bedroom together.  They talked for awhile, apologized to
each other, and defendant agreed to marry the victim.
Defendant alleged that after talking, they had consensual
sex.

After sex, they continued talking about marriage.
Defendant eventually got up and went to the kitchen to check
the telephone messages and heard a sexually suggestive

6

1  message from another man. Defendant confronted the victim

2  about the message and she admitted that she had had sex with

3  another man while defendant was in jail. Defendant admitted

4  that he became angry, hit the victim in the face, shoved her

5  to the floor, and hit her with a plate.

6

7  Defendant admitted to disconnecting the telephone line

8  and cutting the cord, but claimed that he did so out of

9  anger, not to stop the victim from calling the police,

10  because there was another telephone in the bedroom that she

11  could have used. Defendant also admitted that he told the

12  victim, "People have gotten killed for stuff like this," but

13  denied threatening to kill her. Defendant claimed that he

14  tried to help the victim clean her wound and helped her lay

15  down on the couch. Defendant claimed that the next morning

16  he offered to take her to the hospital once he got the

17  children ready for school. But while he was loading the

18  children into the car, the victim fled out the sliding door.

19

20  After the victim fled, defendant admitted that he was

21  afraid he would go back to jail. Defendant claimed that he

22  went to Georgia for a while to stay with family. Defendant

23  came back to California to turn himself in upon learning

24  that there was a warrant for his arrest. Defendant

25  explained that he admitted to the arresting officers that he

26  struck the victim, but told them the sex was consensual.

27

28  (Respondent's Lodgment 5, at 3-7).

7

**PETITIONER'S CONTENTIONS**

Petitioner contends:

1.   The evidence allegedly is insufficient to support the conviction for torture;

2.   The introduction of "evidence that Petitioner engaged in several prior acts of domestic violence to prove that Petitioner had the propensity to committ [sic] the current offense" allegedly violated Petitioner's constitutional rights;

3.   The giving of CALJIC No. 2.50.02 allegedly violated Petitioner's constitutional rights;

4.   The giving of CALJIC No. 2.62 allegedly violated Petitioner's constitutional rights; and

5.   The giving of CALJIC No. 17.41.1 allegedly violated Petitioner's constitutional rights.

(Petition at 5-6a).

**STANDARD OF REVIEW**

Under the "Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"), a federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to

8

1  any claim that was adjudicated on the merits in state court

2  proceedings unless the adjudication of the claim: (1) "resulted in a

3  decision that was contrary to, or involved an unreasonable application

4  of, clearly established Federal law, as determined by the Supreme

5  Court of the United States"; or (2) "resulted in a decision that was

6  based on an unreasonable determination of the facts in light of the

7  evidence presented in the State court proceeding." 28 U.S.C. §

8  2254(d) (as amended); see also Woodford v. Visciotti, 537 U.S. 19, 24-

9  26 (2002); Early v. Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor,

10  529 U.S. 362, 405-09 (2000).

11

12      "Clearly established Federal law" refers to the governing legal

13  principle or principles set forth by the Supreme Court at the time the

14  state court renders its decision. Lockyer v. Andrade, 538 U.S. 63

15  (2003). A state court's decision is "contrary to" clearly established

16  Federal law if: (1) it applies a rule that contradicts governing

17  Supreme Court law; or (2) it "confronts a set of facts. . . materially

18  indistinguishable" from a decision of the Supreme Court but reaches a

19  different result. See Early v. Packer, 537 U.S. at 8 (citation

20  omitted); Williams v. Taylor, 529 U.S. at 405-06.

21

22      Under the "unreasonable application prong" of section 2254(d)(1),

23  a federal court may grant habeas relief "based on the application of a

24  governing legal principle to a set of facts different from those of

25  the case in which the principle was announced." Lockyer v. Andrade,

26  538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537

27  U.S. at 24-26 (state court decision "involves an unreasonable

28  application" of clearly established federal law if it identifies the

9

1  correct governing Supreme Court law but unreasonably applies the law
2  to the facts).

4      A state court's decision "involves an unreasonable application of
5  [Supreme Court] precedent if the state court either unreasonably
6  extends a legal principle from [Supreme Court] precedent to a new
7  context where it should not apply, or unreasonably refuses to extend
8  that principle to a new context where it should apply." Williams v.
9  Taylor, 529 U.S. at 407 (citation omitted).

11      "In order for a federal court to find a state court's application
12  of [Supreme Court] precedent 'unreasonable,' the state court's
13  decision must have been more than incorrect or erroneous." Wiggins v.
14  Smith, 539 U.S. 510, 520 (2003) (citation omitted). "The state
15  court's application must have been 'objectively unreasonable.'" Id.
16  at 520-21 (citation omitted); see also Davis v. Woodford, 384 F.3d
17  628, 637-38 (9th Cir. 2004), cert. dism'd, 545 U.S. 1165 (2005). In
18  applying these standards, this Court looks to the last reasoned state
19  court decision, here the decision of the California Court of Appeal.
20  See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

**DISCUSSION**

For the reasons discussed below, the Court should deny and dismiss the Petition with prejudice.[1]

## I. Petitioner's Challenge to the Sufficiency of the Evidence Supporting the Torture Conviction Does Not Merit Habeas Relief.

On habeas corpus, the Court's inquiry into the sufficiency of evidence is limited.  Evidence is sufficient unless the charge was "so totally devoid of evidentiary support as to render [Petitioner's] conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment."  Fish v. Cardwell, 523 F.2d 976, 978 (9th Cir. 1975), cert. denied, 423 U.S. 1062 (1976) (citations and quotations omitted).  The evidence is to be considered "in the light most favorable to the prosecution."  McDaniel v. Brown, 130 S. Ct. 665, 673 (2010) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979); internal quotations omitted).  A conviction cannot be disturbed unless the Court determines that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. at 317.

A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved

---

[1]    The Court has read, considered and rejected on the merits all of the claims argued in the Petition and the Traverse. The Court discusses Petitioner's principal claims herein.

11

any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson v. Virginia, 443 U.S. at 326. "The reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." United States v. Hubbard, 96 F.3d 1223, 1226 (9th Cir. 1996) (citation omitted); see also Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997). "[T]he prosecution need not affirmatively rule out every hypothesis except that of guilt. . . ." Drayden v. White, 232 F.3d 704, 709 (9th Cir. 2000), cert. denied, 532 U.S. 984 (2001) (citation omitted). This Court cannot grant habeas relief on Petitioner's challenge to the sufficiency of the evidence unless the state court's decision constituted an "unreasonable application of" Jackson v. Virginia. See Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005), cert. denied, 546 U.S. 1137 (2006).

California Penal Code section 206 provides that "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture." Section 12022.7 defines "great bodily injury" as "a significant or substantial physical injury." Cal. Penal Code § 12022.7(f). Thus, the crime of torture has only two elements: "(1) A person inflicted great bodily injury upon the person of another; and (2) the person inflicting the injury did so with specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." CALJIC No. 9.90; accord People v. Aguilar, 58

1  Cal. App. 4th 1196, 1206, 68 Cal. Rptr. 2d 619 (1997) ("CALJIC No.
2  9.90 correctly sets forth the elements of the crime of torture . .
3  .").

4

5        Petitioner does not and cannot dispute the sufficiency of the
6  evidence to support the first element of torture, the infliction of
7  "great bodily injury."  In fact, the trial evidence was virtually
8  undisputed that Petitioner threw a plate at the victim, thereby
9  inflicting a bone-deep laceration on the victim's head (R.T. 110, 115,
10 145, 205, 249, 270, 416, 465-66).  Lacerations can constitute "great
11 bodily injury" within the meaning of section 206.  See, e.g., People
12 v. Escobar, 3 Cal. 4th 740, 752, 12 Cal. Rptr. 2d 586, 837 P.2d 1100
13 (1992); People v. Jung, 71 Cal. App. 4th 1036, 1042, 84 Cal. Rptr. 2d
14 5 (1999).  Beyond the laceration, the victim also testified that the
15 incident caused her severe pain, an increase in the frequency of her
16 headaches, and a loss of short-term memory (R.T. 145-47).

17

18       Petitioner disputes the second element of torture, arguing that
19 he did not inflict the injury with the specific intent to cause cruel
20 or extreme pain and suffering for the purpose of revenge or for any
21 sadistic purpose.  The requisite intent for torture "can be
22 established not only by the circumstances of the offense, but also
23 from other circumstantial evidence."  People v. Hale, 75 Cal. App. 4th
24 94, 107, 88 Cal. Rptr. 2d 904 (1999) (citations and quotations
25 omitted).  Neither the brevity of an attack nor the absence of a
26 premeditated intent to torture precludes a finding of the requisite
27 intent.  See id., 75 Cal. App. 4th at 107-08; People v. Aguilar, 58
28 Cal. App. 4th 1196, 1207, 68 Cal. Rptr. 2d 619 (1997).

1        When considered "in the light most favorable to the prosecution,"

2   trial evidence established the following:  When the victim attempted

3   to end her romantic relationship with Petitioner in December of 1999,

4   Petitioner responded with violence against the victim and went to jail

5   as a result (R.T. 96-97); Petitioner regarded the victim as having

6   been responsible for causing him to have to "live in a box" in jail

7   (R.T. 120); while Petitioner was still in jail, the victim told

8   Petitioner she had met someone else (R.T. 98); Petitioner became upset

9   (R.T. 100-01); the very night of Petitioner's release from jail,

10  Petitioner went to the victim's home with the specific intent of

11  "kicking her ass again" (R.T. 227, 237); Petitioner intended to "beat

12  her ass" "for fucking around on him" (R.T. 225); once inside the

13  victim's home, Petitioner initially pretended to be nice while

14  harboring the intent to beat the victim (R.T. 228); Petitioner accused

15  the victim of being with another man, unplugged the phone, and hit the

16  victim hard one to three times in the face with Petitioner's closed

17  fist (R.T. 108-10, 270); as the victim was trying to get up from the

18  floor, Petitioner hit the victim in the forehead with a dinner plate

19  and blood poured from the wound (R.T. 110); instead of administering

20  to the victim's obvious pain, Petitioner continued to berate the

21  victim for her supposed infidelity and threatened to kill her (R.T.

22  113, 126, 271-72); Petitioner cut up the phone cord and kept the

23  victim prisoner in her own house for hours while she continued to

24  bleed (R.T. 114, 122-31); despite the victim's pain and repeated pleas

25  for medical help, Petitioner refused to call 911 and threatened to

26  kill the victim if she left the house (R.T. 125-26, 275-76); although

27  Petitioner later admitted he had administered more than an "average"

28  or "normal" beating, he still felt unsatisfied, and he vowed to do the

1   same thing again whenever he next gains release from custody (R.T.

2   227-29, 237-38).

3

4         As the Court of Appeals reasonably observed, these "circumstances

5   are damning . . . there was ample evidence to support a finding that

6   [Petitioner] harbored the sadistic purpose of gaining 'satisfaction'

7   from the beatings and was seeking revenge for the victim's infidelity"

8   (Lodgment 5 at 8).  A rational jury could have found beyond a

9   reasonable doubt the requisite intent for torture.[2]

10

11        Therefore, the Court of Appeal's rejection of Petitioner's

12  insufficiency of the evidence claim was not contrary to, or an

13  objectively unreasonable application of, any clearly established

14  Federal law as determined by the United States Supreme Court.  See

15  28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on

16  this claim.

17  ///

18  ///

19  ///

20  ///

21

22  _____

23        [2]    Petitioner suggests that "it may be instructive to
    contrast the facts of Petitioner's case with the facts of
24  published Appellate opinions finding sufficient evidence to
    support a conviction for torture" (Traverse at 7).  However, the
25  fact "[t]hat other victims of torture may have suffered more than
    the victim in this case sheds no light on the sufficiency of the
26  evidence of . . . intent to cause [the victim] severe pain and
    suffering." People v. Jung, 71 Cal. App. 4th 1036, 1043, 84 Cal.
27  Rptr. 2d 5 (1999).  No published case has failed to discern
    constitutionally sufficient evidence of torture on facts similar
28  to the facts of the present case.

15

II.   **Plaintiff's Challenge to the Introduction of "Propensity"**
      **Evidence Does Not Merit Habeas Relief.**

        Petitioner argues that the trial court violated clearly
established federal law by allowing the introduction under California
Evidence Code section 1109 of prior acts of domestic violence to show
Petitioner's criminal "propensity."  This argument must be rejected.

        The United States Supreme Court has never held that the
introduction of prior bad act evidence to show criminal propensity
violates due process.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5
(1991) ("we express no opinion on whether a state law would violate
the Due Process Clause if it permitted the use of 'prior crimes'
evidence to show propensity to commit a charged crime"); see also
Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008), cert. denied,
129 S. Ct. 941 (2009) (rejecting habeas petitioner's challenge to
introduction of propensity evidence, where petitioner could point to
no Supreme Court precedent establishing that the introduction of
otherwise relevant propensity evidence violated the Constitution);
Alberni v. McDaniel, 458 F.3d 860, 864 (9th Cir. 2006), cert. denied,
549 U.S. 1287 (2007) (rejecting challenge to introduction of
propensity evidence in light of Supreme Court's express refusal to
consider the issue in Estelle v. McGuire).  Accordingly, Petitioner is
not entitled to habeas relief on this claim.

///
///
///
///
///

III. **Petitioner's Claim Regarding CALJIC 2.50.02 Does Not Merit Habeas Relief.**

Petitioner also complains of CALJIC 2.50.02, the instruction given concerning the evidence of prior domestic violence:

> If you find the defendant has committed a prior offense involving domestic violence, you may, but are not required to, infer the defendant had a disposition to commit other offenses involving domestic violence. If you find the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.

> However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. The weight and significance, if any, are for you to decide (R.T. 705-06).

Petitioner argues that this instruction invited an improper permissive inference and lowered the prosecution's burden of proof. Neither argument has any merit.

The Due Process Clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the charged crime. In re Winship, 397 U.S. 358, 364

17

1  (1970).  The State may not use evidentiary presumptions in a jury

2  charge which have the effect of relieving the prosecution of its

3  burden to prove every essential element of the crime beyond a

4  reasonable doubt.  See Francis v. Franklin, 471 U.S. 307, 313 (1985);

5  Sandstrom v. Montana, 442 U.S. 510, 520-24 (1979).

6

7      A permissive inference instruction, such as the instruction

8  challenged here, is constitutional if the conclusion the instruction

9  suggests can be justified by reason and common sense in light of the

10  proven facts before the jury.  Francis v. Franklin, 471 U.S. at 314-

11  15; Hanna v. Riveland, 87 F.3d 1034, 1037 (9th Cir. 1996); United

12  States v. Warren, 25 F.3d 890, 897 (9th Cir. 1994).  A permissive

13  inference instruction does not affect the application of the "beyond a

14  reasonable doubt" proof standard unless there is no rational way the

15  jury could make the connection permitted by the inference.  Ulster

16  County Court v. Allen, 442 U.S. 140, 157 (1979) ("Because [a]

17  permissive inference instruction leaves the trier of fact free to

18  credit or reject the inference and does not shift the burden of proof,

19  it affects the application of the 'beyond a reasonable doubt' standard

20  only if, under the facts of the case, there is no rational way the

21  trier [of fact] could make the connection permitted by the

22  inference."); United States v. Warren, 25 F.3d at 897 n.4.

23

24      In the present case, a rational trier of fact could make a

25  connection between Petitioner's prior acts of domestic violence and

26  current charges involving domestic violence.  See Rucker v. Lattimore,

27  2010 WL 750039, at *2 (9th Cir. Mar. 4, 2010); Brummett v. Clark, 2009

28  WL 3157505, at *6-7 (E.D. Cal. Sept. 28, 2009).  Here, like in

18

1    Brummett (and unlike the circumstance in Gibson v. Ortiz, 387 F.3d 812
2    (9th Cir. 2004), overruled, Berg v. Lewis, 566 F.3d 855 (9th Cir.
3    2009)), the "jurors in petitioner's case were explicitly told that
4    they could not find petitioner guilty based solely on his prior
5    offenses, and that the prosecution was required to prove his guilt on
6    the charged (or lesser) crimes beyond a reasonable doubt." Brummett,
7    supra.  No constitutional error occurred.  Id.; see Hanna v. Riveland,
8    87 F.3d at 1038 (permissive inference instructions generally do not
9    effect constitutional error where, as here, other instructions
10   "condition, qualify or explain them").

11

12          In the present case, the Court of Appeal interpreted the
13   permissive inference in CALJIC No. 2.50.02 as unrelated to the torture
14   charge (Lodgment 5 at 10).  The Court of Appeal reasoned that the
15   torture charge, unlike the charge of corporal injury on a cohabitant,
16   is not an offense necessarily "involving domestic violence."  Id.  The
17   Court of Appeal's interpretation is not objectively unreasonable.

18

19          To the extent Petitioner argues that the jury nevertheless may
20   have misinterpreted the instruction as applicable to the torture
21   charge, any instructional error was harmless.  In a federal habeas
22   action, the applicable harmless error standard is the standard set
23   forth in Brecht v. Abrahamson, 507 U.S. 619 (1993) ("Brecht").  Brecht
24   forbids a grant of habeas relief for a trial-type error unless the
25   error had a "substantial and injurious effect or influence in
26   determining the jury's verdict."  Brecht, at 637-38.  Contrary to
27   Petitioner's argument, any error regarding this instruction is not
28   structural error; it is error subject to the Brecht standard.  See

19

1   Byrd v. Lewis, 566 F.3d 855, 866 (9th Cir. 2009) (instructional error

2   "that affects only an element of the offense, a permissible

3   evidentiary inference, or a potential theory of conviction" is not

4   structural error) (citing Neder v. United States, 527 U.S. 1, 10

5   (1999) and Hedgpeth v. Pulido, 129 S. Ct. 530, 532 (2008).  In the

6   present case, the allegedly erroneous instruction did not have a

7   substantial or injurious effect or influence on the jury's verdict.

8   The instruction did not specifically reference the torture charge.

9   The instruction expressly left to the jury the issues of "weight and

10  significance" (R.T. 706).  The circumstantial evidence supporting the

11  requisite intent for torture was strong.  In argument, the prosecution

12  did not invite the jury to apply the challenged instruction to the

13  torture charge.  Accordingly, the error, if any, was harmless under

14  Brecht, and Petitioner is not entitled to habeas relief on this claim.

15

16  **IV.   The Giving of CALJIC No. 2.62 Does Not Merit Habeas Relief.**

17

18        As given to Petitioner's jury, CALJIC No. 2.62 provided:

19

20        In this case, the defendant has testified to certain

21        matters.  If you find the defendant has failed to explain or

22        deny any evidence against him introduced by the prosecution

23        which he can reasonably be expected to deny or explain

24        because of facts within his knowledge, you may take that

25        failure into consideration as tending to indicate the truth

26        of this evidence and as indicating that among the inferences

27        that may reasonably be drawn therefrom those unfavorable to

28        the defendant are the more probable.

1    The failure of the defendant to deny or explain evidence

2    against him does not, by itself, warrant an inference of

3    guilt, nor does it relieve the prosecution of its burden of

4    proving every essential element of the crime and the guilt

5    of the defendant beyond a reasonable doubt (R.T. 706-07).

6

7        The Court of Appeal characterized the inclusion of this

8    instruction as "probably unwarranted," but "harmless" (Lodgment 5 at

9    9).   The Court of Appeal reasoned that "[t]he jury was expressly

10   instructed to first determine whether defendant actually failed to

11   explain something before drawing unfavorable inferences; as a result,

12   the jury can be trusted to properly decide if there were no

13   unexplained allegations and no resulting unfavorable inferences to be

14   drawn."   Id.

15

16       The giving of CALJIC No. 2.62 in this case, even if erroneous,

17   does not entitle Petitioner to habeas relief.   "[I]nstructions that

18   contain errors of state law may not form the basis for federal habeas

19   relief."   Gilmore v. Taylor, 508 U.S. 333, 342 (1993); see also

20   Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) ("the fact that the

21   instruction was allegedly incorrect under state law is not a basis for

22   habeas relief"); Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir.

23   1988) (instructional error "does not alone raise a ground cognizable

24   in a federal habeas corpus proceeding").   When a federal habeas

25   petitioner challenges the validity of a state jury instruction, the

26   issue is "whether the ailing instruction by itself so infected the

27   entire trial that the resulting conviction violates due process."

28   Estelle v. McGuire, 502 U.S. at 72; Clark v. Brown, 450 F.3d 898, 904

                                   21

1 (9th Cir.), cert. denied, 549 U.S. 1027 (2006).  The court must

2 evaluate the alleged instructional error in light of the overall

3 charge to the jury.  Middleton v. McNeil, 541 U.S. 433, 437 (2004);

4 Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Villafuerte v. Stewart,

5 111 F.3d 616, 624 (9th Cir. 1997), cert. denied, 522 U.S. 1079 (1998).

6

7      The challenged instruction did not so infect the entire trial as

8 to result in a due process violation.  Presuming that the jury

9 followed the instruction, the instruction had no effect on the trial

10 because an adverse inference comes into play under the instruction

11 only if the jury finds that there were allegations unaddressed by the

12 defendant.  As the Court of Appeal observed, Petitioner "appeared to

13 address all relevant allegations even though his explanations were not

14 always consistent, coherent or reasonable" (Lodgment 5 at 9).  The

15 jury can be presumed to have followed the instruction.  See Weeks v.

16 Angelone, 528 U.S. 225, 226 (2000); Dubria v. Smith, 224 F.3d 995,

17 1001 (9th Cir. 2000), cert. denied, 531 U.S. 1148 (2001).  Therefore,

18 no due process violation occurred.

19

20      For the same reason, the giving of the challenged instruction had

21 no substantial or injurious effect or influence on the jury's verdict,

22 within the meaning of Brecht.  Cf. Hooks v. Scribner, 2009 WL 936677,

23 at *10 (C.D. Cal. Apr. 3, 2009).  Accordingly, Petitioner is not

24 entitled to habeas relief on this claim.

25 ///

26 ///

27 ///

28 ///

**V.    The Giving of CALJIC No. 17.41.1 Does Not Merit Habeas Relief.**

Petitioner challenges the constitutionality of the trial court's use of California's jury nullification instruction, CALJIC 17.41.1.[3] The Court of Appeal rejected this claim, citing People v. Engelman, 28 Cal. 4th 436, 439-49, 121 Cal. Rptr. 2d 862, 864-72, 49 P.3d 209 (2002), in which the California Supreme Court held CALJIC 17.41.1 did not violate a defendant's constitutional rights (Lodgment 5 at 10-11).[4] "[N]o Supreme Court case establishes that an instruction such as CALJIC 17.41.1 violates an existing constitutional right." Brewer v. Hall, 378 F.3d 952, 956 (9th Cir. 2004), cert. denied, 543 U.S. 1037 (2004).  Therefore, the Court of Appeal's decision was not contrary to, or an unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court.  Id.; accord Moore v. Chrones, 2010 WL 291774, at *18-19 (C.D. Cal. Jan. 14, 2010).  Petitioner is not entitled to habeas relief on this claim.

///

///

---

[3]    The trial court's instruction to the jury pursuant to CALJIC 17.41.1 stated: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions.  Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of that situation" (R.T. 726-27).

[4]    However, the California Supreme Court invoked its supervisory power to disapprove the future use of the instruction.  See People v. Engelman, 28 Cal. 4th at 446-49, 121 Cal. Rptr. 2d at 870-72.

**RECOMMENDATION**

    For the reasons discussed above, IT IS RECOMMENDED that the Court issue an order: (1) approving and adopting this Report and Recommendation; and (2) denying and dismissing the Petition with prejudice.


        DATED:  May 17, 2010.


                         _____/s/_____
                              CHARLES F. EICK
                         UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.

If the District Judge enters judgment adverse to Petitioner, the District Judge will, at the same time, issue or deny a certificate of appealability.  Within twenty (20) days of the filing of this Report and Recommendation, the parties may file written arguments regarding whether a certificate of appealability should issue.